Elaine A. Ryan (AZ Bar #012870)
Colleen M. Auer (AZ Bar #014637)
**AUER RYAN, P.C.**
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
520-705-7332
eryan@auer-ryan.com
cauer@auer-ryan.com

Samuel J. Strauss (*pro hac vice* forthcoming)
Raina Borrelli (*pro hac vice* forthcoming)
**TURKE & STRAUSS LLP**
613 Williamson St., Suite 201
Madison, WI 53703
Telephone (608) 237-1775
sam@turkestrauss.com
raina@turkestrauss.com

*Attorneys for the Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas Stretz, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| Freeport Minerals Corporation and Freeport-McMoRan Inc., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Thomas Stretz ("Plaintiff") brings this Class Action Complaint, on behalf of himself and all others similarly situated (the "Class") against Defendants Freeport Minerals Corporation and Freeport-McMoRan Inc., (collectively "Freeport-McMoRan" or

"Defendant") alleging as follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiff.

## NATURE OF CASE

1.    Between August 8, 2023, to August 11, 2023, Freeport-McMoRan, a leading international mining company, lost control over its computer network and the highly sensitive personal information of its current and former employees stored on that computer network in a data breach perpetrated by cybercriminals ("Data Breach").

2.    On information and belief, the Data Breach began on or around August 8, 2023, when cybercriminals first accessed Defendant's network, and continued until at least August 11, 2023, three days later. Following an internal investigation, Defendant learned cybercriminals gained unauthorized access to current and former employees' personally identifiable information ("PII").

3.    On or about September 8, 2023– an entire month after the Data Breach occurred and when Defendant first learned of the Data Breach – Freeport-McMoRan finally began notifying Class Members about the Data Breach ("Breach Notice"). Plaintiff's Breach Notice has been attached as Exhibit A.

4.    Defendant waited a month before informing Class Members even though Plaintiff and approximately 1,300 Class Members had their most sensitive personal information accessed, exfiltrated, and stolen, causing them to suffer ascertainable losses in the form of the loss of the benefit of their bargain and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

5.    Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering them easy targets for cybercriminals.

6.      Defendant's Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell its employees how many people were impacted, how the breach happened, or why it took the Defendant one month to begin notifying victims that cybercriminals had gained access to their highly private information.

7.      Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

8.      Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

9.      In failing to adequately protect employees' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former employees.

10.     Plaintiff and members of the proposed Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

11.     Plaintiff Thomas Stretz is a former Freeport-McMoRan employee and Data Breach victim. Mr. Stretz worked for Freeport-McMoRan from approximately September 2012 until September 2020.

12.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

**PARTIES**

13.     Plaintiff, Thomas Stretz, is a natural person and citizen of California, residing in Carpinteria, California, where he intends to remain.

3

14.    Defendant, Freeport Minerals, is incorporated in Delaware, with its principal place of business at 333 N. Central Ave., Phoenix, AZ 85013. Defendant can be served through its registered agent, Registered Agent Solutions, Inc., at 300 W. Clarendon Ave., Suite 240, Phoenix, AZ 85013.

15.    Defendant, Freeport-McMoRan, is incorporated in Delaware, with its principal place of business at 333 N. Central Ave., Phoenix, AZ 85013. Defendant can be served through its registered agent, Registered Agent Solutions, Inc., at 300 W. Clarendon Ave., Suite 240, Phoenix, AZ 85013.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class. Defendant and Plaintiff are citizens of different states.

17.    This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District and does substantial business in this District.

18.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### Freeport-McMoRan

19.    Freeport-McMoRan touts itself as "a leading international mining company" operating "large, long lived geographically diverse asserts."[1] It boasts an annual revenue of $21.88 billion.[2]

---

[1] About us, Freeport-McMoRan,  https://www.fcx.com/about (last visited September 13, 2023).

[2] Revenue        for        Freeport—McMoRan,        CompaniesMarketCap, https://companiesmarketcap.com/freeport-

4

20.    On information and belief, Freeport-McMoRan accumulates highly private PII of its employees.

21.    On information and belief, Freeport-McMoRan maintains former employees' PII for years after the employee-employer relationship is terminated.

22.    In collecting and maintaining its employees' PII, Defendant agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

23.    Indeed, Freeport-McMoRan promises in its privacy policy that it is "committed to protecting your privacy" and "we do not sell or otherwise disclose information we collect about you."[3]

24.    Freeport-McMoRan further assures that "we maintain administrative, technical and physical safeguards designed to protect the information you provide on the Services against accidental, unlawful or unauthorized destruction, loss, alteration, access, disclosure or use" and will only "retain your personal information for as long as reasonably necessary."[4]

25.    As a company that claims to be "a leading [] company" with core values of "safety, respect, integrity, excellence and commitment"[5], Freeport-McMoRan understood the need to protect its current and former employees' PII and prioritize its data security.

26.    Despite recognizing its duty to do so, on information and belief, Freeport-McMoRan has not implemented reasonably cybersecurity safeguards or policies to protect employee PII or trained its IT or data security employees to prevent, detect, and stop

---

mcmoran/revenue/#:~:text=According%20to%20Freeport%2DMcMoRan's%20latest,sale%20of%20goods%20or%20services (last visited June 3, 2023).

[3] Privacy Policy, Freeport-McMoRan, https://www.fcx.com/freeport-mcmoran-online-privacy-notice (last visited September 13, 2023).

[4] *Id.*

[5] About us, Freeport-McMoRan,  https://www.fcx.com/about (last visited September 13, 2023).

breaches of its systems. As a result, Freeport-McMoRan leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' PII.

***The Data Breach***

27. Plaintiff is a former employee of Freeport-McMoRan.

28. As a condition of employment with Freeport-McMoRan, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

29. On information and belief, Freeport-McMoRan collects and maintains employees' unencrypted PII in its computer systems.

30. In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to their internal policies, as well as state and federal law.

31. According to the Breach Notice, Freeport-McMoRan claims to have "identified suspicious activity on our systems" on August 8, 2023. Ex. A. Freeport-McMoRan further admits that despite identifying suspicious activity in its systems on August 8, 2023, the unauthorized third party continued to have access to Freeport-McMoRan for another three days.

32. In other words, the Data Breach investigation revealed that cybercriminals had unfettered access to Freeport-McMoRan's current and former employees' PII for, at minimum, three whole days after discovery and that Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of hundreds of its employees' highly private information.

33. Freeport-McMoRan announced that the following types of highly private information were compromised in Defendant's Data Breach:

6

      a.  Names;

      b.  Dates of Birth;

      c.  Social Security numbers; and,

      d.  Email Addresses.

34.    Freeport-McMoRan has further admitted that PII was actually stolen during the Data Breach, declaring that the "unauthorized third party **had obtained** personal information." Ex. A.

35.    Through its inadequate security practices, Defendant exposed Plaintiff's and the Class's PII for theft and sale on the dark web.

36.    On or about September 8, 2023–an entire month after the Data Breach occurred and the Defendant first learned of the Data Breach – Freeport-McMoRan finally notified Plaintiff and Class Members about the Data Breach.

37.    Despite its duties and alleged commitments to safeguard PII, Defendant, a self-proclaimed leader in its industry, did not in fact follow industry standard practices in securing employees' PII, as evidenced by the Data Breach.

38.    In response to the Data Breach, Freeport-McMoRan contends that employees should "be assured that we are taking steps to address the incident and to protect the security of your data." Ex. A. Although Defendant fails to expand on what these alleged "steps" are, such steps should have been in place before the Data Breach.

39.    Through its Breach Notice, Defendant also recognized the actual imminent harm and injury that flowed from the Data Breach, so it "strongly recommend[ed]" that breach victims "remain vigilant and regularly review and monitor all your credit history to guard against any unauthorized transactions or activity" and to "closely monitor your account statements and notify your financial institution if you suspect any unauthorized activity". Ex. A.

40.    Freeport-McMoRan further recognized through its Breach Notice, its duty to implement reasonable cybersecurity safeguards or policies to protect its customers' PII,

promising that, despite the Breach demonstrating otherwise, that "our priority has been the safety, protection, and well-being of our employees." Ex. A

41.    On information and belief, Freeport-McMoRan has offered several months of complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers.

42.    Even with several months' worth of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

43.    Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine it with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

44.    On information and belief, Freeport-McMoRan failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its employees' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

***The Data Breach was a Foreseeable Risk of which Defendant was on Notice.***

45.    It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

46.    In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[6]

---

[6]Data    breaches    break    record    in    2021,    CNET, https://www.cnet.com/news/privacy/record-number-of-data-breaches-reported-in-2021-new-report-says/  (last accessed May 16, 2023).

47.   In light of recent high profile data breaches, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Freeport-McMoRan knew or should have known that its electronic records would be targeted by cybercriminals.

48.   Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

49.   Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite their own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

50.   In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

51.   In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[7]

52.   In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously

---

[7] High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations, FBI, available at https://www.ic3.gov/Media/Y2019/PSA191002  (last accessed Sept. 14, 2023).

aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[8]

53.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[9]

54.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

55.    In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former employees in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

56.    Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's

---

[8]  Ransomware mentioned in 1,000+ SEC filings over the past year, ZDNet, https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed Sept. 14, 2023).

[9]  Ransomware Guide, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last accessed Sept. 14, 2023).

society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

57.    Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its employees' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff's Experience***

58.    From approximately September 2012 until September 2020, Plaintiff was employed by Defendant.

59.    As a condition of employment, Freeport-McMoRan required Mr. Stretz to provide his PII, including his name, date of bith, Social Security number, and email address.

60.    Mr. Stretz provided his PII to Freeport-McMoRan and trusted that the company would use reasonable measures to protect it according to Freeport-McMoRan's internal policies and state law.

61.    Mr. Stretz reasonably believed that part of his compensation package, and the services he provided to Freeport-McMoRan through his employment, would be used for adequate cybersecurity protection for his PII.

62.    Mr. Stretz received Notice from Freeport-McMoRan on September 13, 2023, stating that his PII was exposed during the Data Breach

63.    Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it for a month.

64.    Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

65.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

66.    Defendant exposed Plaintiff's PII for theft by cybercriminals and sale on the dark web.

11

67.    Plaintiff does not recall ever learning that his PII was compromised in a data breach incident, other than the breach at issue in this case.

68.    As a result of the Data Breach and the recommendations of Defendant's Notice, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through the three main credit bureaus, and monitoring his credit information as suggested by Defendant.

69.    Plaintiff has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

70.    Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's delay in informing Plaintiff and Class Members about the Data Breach.

71.    In fact, following the Data Breach, Plaintiff began receiving significant amounts of spam calls, texts, and emails, suggesting that Plaintiff's information has been stolen and placed in the hands of cybercriminals.

72.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

73.    Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

74.    As a result of Freeport-McMoRan's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the class have suffered or are at an increased risk of suffering:

     a.  The loss of the opportunity to control how their PII is used;

     b.  The diminution in value of their PII;

     c.  The compromise and continuing publication of their PII;

     d.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

     e.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

     f.  Delay in receipt of tax refund monies;

     g.  Unauthorized use of stolen PII; and

     h.  The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in their possession.

75.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

76.    The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

13

77.     Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

78.     It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

79.     One such example of criminals using PII for profit is the development of "Fullz" packages.

80.     Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

81.     The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

82.     Defendant disclosed the PII of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and members of the proposed Class to people engaged in disruptive and unlawful business practices and tactics, including online account

14

hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

83.     Defendant's failure to properly notify Plaintiff and the Class of the Data Breach exacerbated Plaintiff's and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant failed to adhere to FTC guidelines.***

84.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

85.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

   a.   protect the personal customer information that they keep;

   b.   properly dispose of personal information that is no longer needed;

   c.   encrypt information stored on computer networks;

   d.   understand their network's vulnerabilities; and

   e.   implement policies to correct security problems.

86.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

87.     The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

88. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer, or in this case, employee, data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## CLASS DEFINITION AND ALLEGATIONS

90. Plaintiff sues on behalf of himself and the proposed nationwide class ("Class") and state subclass ("Subclass"), defined as follows, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3):

**Nationwide Class:**

> **All individuals residing in the United States whose PII was compromised in the Freeport-McMoRan Data Breach including all those who received notice of the breach.**

**California Subclass:**

> **All individuals residing in California whose PII was compromised in the Freeport-McMoRan Data Breach including all those who received notice of the breach.**

91. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

92. Plaintiff reserves the right to amend the class definition.

16

93.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

94.    **Numerosity**. The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believes that the proposed Class includes at least 1,300 who have been damaged by Defendant's conduct as alleged herein.

95.    **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, the following:

    a.   whether Defendant engaged in the wrongful conduct alleged herein;

    b.   whether the alleged conduct constitutes violations of the laws asserted;

    c.   whether Defendant owed Plaintiff and the other Class Members a duty to adequately protect their PII;

    d.   whether Defendant breached its duty to protect the PII of Plaintiff and the other Class Members;

    e.   whether Defendant knew or should have known about the inadequacies of its data protection, storage, and security;

    f.   whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and the other Class Members' PII from unauthorized theft, release, or disclosure;

    g.   whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems and digital storage environment;

    h.   whether Defendant had the proper computer systems to safeguard and protect Plaintiff's and the other Class Members' PII from unauthorized theft, release or disclosure;

17

i. whether Defendant breached the promise to keep Plaintiff's and the Class Members' PII safe and to follow federal data security protocols;

j. whether Defendant's conduct was the proximate cause of Plaintiff's and the other Class Members' injuries;

k. whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

l. whether Plaintiff and the other Class Members suffered ascertainable and cognizable injuries as a result of Defendant's conduct;

m. whether Plaintiff and the other Class Members are entitled to recover actual damages and/or statutory damages; and,

n. whether Plaintiff and the other Class Members are entitled to other appropriate remedies, including injunctive relief.

96. Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of himself and the other Class Members. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

97. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. Defendant's misconduct impacted all Class Members in a similar manner.

98. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Members of the Class, has retained counsel experienced in complex consumer class action litigation, and intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

99. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and

18

expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done to them. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts and would also increase the delay and expense to all parties and the courts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale and comprehensive supervision a single court, and presents no unusual management difficulties under the circumstances here.

100.  Plaintiff and Class Members are ascertainable because Defendant's records will identify all victims of Defendant's Data Breach.

101.  Plaintiff and Class Members are sufficiently numerous to justify class action. Specifically, the putative Class contains several hundred individuals.

102.  Plaintiff and Class Members have a well-defined community of interest in pursuing relief from the harm that resulted from the Data Breach, including (1) predominant common questions of law or fact; (2) a class representative with claims or defenses typical of the class; and (3) a class representative who can adequately represent the class.

103.  The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

19

104.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

105.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

106.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

107.   Plaintiff restates and realleges all allegations above and hereafter as if fully set forth herein.

108.   Defendant owed to Plaintiff and other members of the Class a duty to exercise reasonable care in handling and using the PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

109.   Defendant owed a duty of care to Plaintiff and members of the Class because it was foreseeable that Defendant's failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that PII —just like the Data Breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class's PII by disclosing and providing access to this information to third parties and

by failing to properly supervise both the manner in which the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

110. Defendant owed Plaintiff and members of the Class a duty to notify them within a reasonable time frame of any breach to the security of their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary in order for Plaintiff and members of the Class to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the harm caused by the Data Breach.

111. Defendant owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiff's and members of the Class's PII.

112. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII.

113. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and members of the Class and the importance of exercising reasonable care in handling it.

114. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and members of the Class which actually and proximately caused the Data Breach and Plaintiff's and members of the Class's injury. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused

and exacerbated the harm from the Data Breach and Plaintiff's and members of the Class's injuries-in-fact. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and members of the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

115.  Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's PII.

116.  Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers or, in this case, employees' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff's and the members of the Class's sensitive PII.

117.  Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and the Class's PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to its employees in the event of a breach, which ultimately came to pass.

118.  The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

22

119.  Defendant had a duty to Plaintiff and the members of the Class to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class's PII.

120.  Defendant breached its respective duties to Plaintiff and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's PII.

121.  Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

122.  Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

123.  But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and members of the Class, Plaintiff and members of the Class would not have been injured.

124.  Defendant's breach of its common-law duties to exercise reasonable care and its duties under Section 5 of the FTC Act actually and proximately caused Plaintiff's and members of the Class's actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class)

125.  Plaintiff restates and realleges all allegations above and hereafter as if fully set forth herein.

126.  Plaintiff and the Class entrusted their PII to Defendant at the time they entered into an employment relationship with Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

127.  Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

128.  Defendant breached the implied contracts it made with Plaintiff and the Class by failing to adequately safeguard and protect their PII, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

129.  As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

130.  As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

/ / / /

/ / / /

24

### THIRD CAUSE OF ACTION
**Violation of California's Unfair Competition Law ("UCL")**
**Unlawful Business Practice**
**(Cal Bus. & Prof. Code § 17200, *et seq*.)**
**(On Behalf of Plaintiff and the California Subclass)**

131.  Plaintiff restates and realleges all allegations above and hereafter as if fully set forth herein.

132.  Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

133.  Defendant's conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq*. (the "CCPA"), and other state data security laws.

134.  Defendant stored the PII of Plaintiff and the Class in its computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiff's and the Class's PII secure so as to prevent the loss or misuse of that PII.

135.  Defendant failed to disclose to Plaintiff and the Class that their PII was not secure. However, Plaintiff and the Class were entitled to assume, and did assume, that Defendant had secured their PII. At no time were Plaintiff and the Class on notice that their PII was not secure, which Defendant had a duty to disclose.

136.  Defendant also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and the Class's nonencrypted and nonredacted PII.

137.  Had Defendant complied with these requirements, Plaintiff and the Class would not have suffered the damages related to the data breach.

138.  Defendant's conduct was unlawful, in that it violated the CCPA.

25

139.  Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, *inter alia*, Section 5(a) of the Federal Trade Commission Act.

140.  Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

141.  Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting PII.

142.  Defendant also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

143.  Instead, Defendant made the PII of Plaintiff and the Class accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiff and the Class to an impending risk of identity theft. Additionally, Defendant's conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

144.  As a result of those unlawful and unfair business practices, Plaintiff and the Class suffered an injury-in-fact and have lost money or property.

145. The injuries to Plaintiff and the Class greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

146.  There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

147.  Therefore, Plaintiff and the Class are entitled to equitable relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

148.  Plaintiff restates and realleges all allegations above and hereafter as if fully set forth herein.

149.  This claim is pleaded in the alternative to Breach of Implied Contract.

150.  Plaintiff and members of the Class conferred a benefit upon Defendant in the form of services through employment. Defendant also benefited from the receipt of Plaintiff's and members of the Class's PII, as this was used to facilitate their employment.

151.  Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and members of the Class.

152.  Under principals of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff and the proposed Class's services and their PII because Defendant failed to adequately protect their PII. Plaintiff and the proposed Class would not have provided their PII or worked for Defendant at the payrates they did, had they known Defendant would not adequately protect their PII.

153.  Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by it because of its misconduct and Data Breach.

## FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

154.  Plaintiff restates and realleges all allegations above and hereafter as if fully set forth herein.

155.  Given the relationship between Defendant and Plaintiff and Class Members, Defendant became a fiduciary by its undertaking and guardianship of Plaintiff and Class Members' PII, requiring it to act primarily for Plaintiff and Class Members, (1) in the safeguarding of Plaintiff and Class Members' PII; (2) in timely notifying Plaintiff and Class Members of a Data Breach and disclosure; and (3) in maintaining complete and accurate records of what information (and where) Defendant did and does store PII.

156.  Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

157.  Because of the highly sensitive nature of the PII, Plaintiff and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

158.  Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff and Class Members' PII.

159.  Defendant also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

160.  As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

/ / / /

/ / / /

/ / / /

**SIXTH CAUSE OF ACTION**
**Violation of the California Consumer Privacy Act**
**Cal. Civ. Code § 1798.150**
**(On Behalf of Plaintiff and the California Subclass)**

161.  Plaintiff restates and realleges all allegations above and hereafter as if fully set forth herein.

162.  Plaintiff brings this Count on his own behalf and on behalf of the California Subclass (the "Class" for the purposes of this Count).

163.  Defendant violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted PII of Plaintiff and the Class. As a direct and proximate result, Plaintiff's, and the Class's nonencrypted and nonredacted PII was subject to unauthorized access and exfiltration, theft, or disclosure.

164.  Defendant is a business organized for the profit and financial benefit of its owners according to California Civil Code § 1798.140, that collects the personal information of its customers and employees, and whose annual gross revenues exceed the threshold established by California Civil Code § 1798.140(d).

165.  Plaintiff and Class Members seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold PII, including Plaintiff's and Class members' PII. Plaintiff and Class members have an interest in ensuring that their PII is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

166.  Pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendant's registered service agents, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. If Defendant cannot cure within 30 days—and Plaintiff believes such cure is not possible under these facts and

circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

167. As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

168. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, prays for relief as follows:

a. For an order certifying the Classes and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

b. For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

c. For damages in an amount to be determined by the trier of fact;

d. For an order of restitution and all other forms of equitable monetary relief;

e. Declaratory and injunctive relief as described herein;

f. Awarding Plaintiff reasonable attorneys' fees, costs, and expenses as otherwise allowed by law;

g. Awarding pre- and post-judgment interest on any amounts awarded; and

h. Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the putative Classes, demands a trial by jury on all claims so triable.

30

DATED: September 15, 2023                Respectfully Submitted,

*/s/ Elaine A. Ryan*
Elaine A. Ryan (AZ Bar #012870)
Colleen M. Auer (AZ Bar #014637)
**AUER RYAN, P.C.**
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
520-705-7332
eryan@auer-ryan.com
cauer@auer-ryan.com

Samuel J. Strauss*
Raina Borrelli*
**TURKE & STRAUSS LLP**
613 Williamson Street, Suite 201
Madison, Wisconsin 53703
T: (608) 237-1775
F: (608) 509-4423
sam@turkestrauss.com
raina@turkestrauss.com

*\* Pro hac vice forthcoming*

*Attorneys for Plaintiff and the Proposed Class*

# EXHIBIT A

Freeport McMoRan Corporation
c/o Cyberscout
PO Box 1286
Dearborn, MI 48120-9998

**FREEPORT-McMoRan**

Phoenix Corporate Office
333 N. Central Ave.
Phoenix, AZ 85004



PILJMY00104818
THOMAS W STRETZ
413 CALLE DIA
CARPINTERIA, CA 93013-2511

September 8, 2023

## NOTICE OF DATA BREACH

Freeport-McMoRan Inc. ("Freeport") recently announced it experienced a cybersecurity incident that impacted its information systems. You are receiving this letter because we have identified that some of your personal information was disclosed as part of this incident.

### What Happened?

On August 8, 2023, we identified suspicious activity on our systems and immediately launched an investigation. Our investigation subsequently identified unauthorized activity within our information technology environment between approximately August 8 and August 11, 2023. On August 11, 2023, we identified that an unauthorized third party had obtained personal information regarding certain individuals, including current and former Freeport employees.

### What Information was Involved?

Based on our investigation to date, the information that was obtained by the unauthorized third party included your name, date of birth, Social Security number, and email address.

### What We are Doing.

We are offering free identity theft protection services through TransUnion for a period of 24 months. You may sign up for this service by following the instructions included in Attachment A.

When learning about this incident, we took immediate steps to launch a comprehensive investigation, and have notified and been working with law enforcement. We also retained third-party cybersecurity experts to investigate the incident and aid us in securely bringing our systems back online.

When we confirmed that an unauthorized third party had obtained personal information, we quickly began working to identify and notify the individuals affected. Our priority has been the safety, protection and well-being of our employees.

### What You Can Do.

Whether or not you elect to enroll in the identity theft protection services, we strongly recommend that you remain vigilant and regularly review and monitor all your credit history to guard against any unauthorized transactions or activity. We also recommend you closely monitor your account statements and notify your financial institution if you suspect any unauthorized activity. Attachment B contains more information about steps you can take to protect yourself against fraud and identity theft.

### For More Information.

Please be assured that we are taking steps to address the incident and to protect the security of your data. If you have any questions about this notice or the incident, please call the Cyberscout help line at 1-888-499-1088 and give the fraud specialist your unique code listed in Attachment A. Representatives are available between 8 a.m. and 8 p.m. Eastern time, Monday through Friday, excluding holidays.

**ATTACHMENT A**

Identity Theft Protection Services

## What Do the Services Entail?

In response to the incident, we are providing you with access to **Single Bureau Credit Monitoring/Single Bureau Credit Report/Single Bureau Credit Score/Cyber Monitoring** services at no charge. These services provide you with alerts for 24 months from the date of enrollment when changes occur to your credit file. This notification is sent to you the same day that the change or update takes place with the bureau. Cyber monitoring will look out for your personal data on the dark web and alert you if your personally identifiable information is found online. Finally, we are providing you with proactive fraud assistance to help with any questions that you might have or if you become a victim of fraud. These services will be provided by Cyberscout through Identity Force, a TransUnion company specializing in fraud assistance and remediation services.

## How Do I Enroll for the Free Services?

To enroll in Credit Monitoring services at no charge, log on to **https://secure.identityforce.com/benefit/freeport** and follow the instructions provided. When prompted please provide the following unique code to receive services: **K4BP9HT47R**

For you to receive the monitoring services described above, you must enroll within 90 days from the date of this letter. The enrollment requires an internet connection and e-mail account and may not be available to minors under the age of 18. Please note that when signing up for monitoring services, you may be asked to verify personal information for your own protection to confirm your identity.

## What If I Have Questions Regarding This Incident and the Identity Threat Protection Services?

Representatives are available for 90 days from the date of this letter to assist you with questions regarding this incident between 8 a.m. and 8 p.m. Eastern time, Monday through Friday, excluding holidays. Please call the help line at 1-888-499-1088 and give the fraud specialist with your unique code listed above.

**ATTACHMENT B**

Additional Information

To protect against possible fraud, identity theft or other financial loss, we encourage you to remain vigilant, to review your account statements and to monitor your credit reports. Provided below are the names and contact information for the three major U.S. credit bureaus and additional information about steps you can take to obtain a free credit report and place a fraud alert or security freeze on your credit report. If you believe you are a victim of fraud or identity theft, you should consider contacting your local law enforcement agency, your State's attorney general or the Federal Trade Commission.



## INFORMATION ON OBTAINING A FREE CREDIT REPORT

U.S. residents are entitled under U.S. law to one free credit report annually from each of the three major credit bureaus. To order your free credit reports, visit **www.annualcreditreport.com** or call toll-free 1-877-322-8228.

## INFORMATION ON IMPLEMENTING A FRAUD ALERT, CREDIT FREEZE, OR CREDIT LOCK

To place a fraud alert, credit freeze, or credit lock on your credit report, you must contact the three credit reporting agencies below:

| **Equifax:** | **Experian:** | **TransUnion:** |
|---|---|---|
| Equifax Information Services LLC | Credit Fraud Center | Fraud Victim Assistance |
| P.O. Box 105788 | P.O. Box 9554 | Department |
| Atlanta, GA 30348 | Allen, TX 75013 | P.O. Box 2000 |
| 1-888-298-0045 | 1-888-397-3742 | Chester, PA 19022-2000 |
| **www.equifax.com** | **www.experian.com** | 1-800-680-7289 |
| | | **www.transunion.com** |

**Fraud Alert:** Consider contacting the three major credit reporting agencies at the addresses above to place a fraud alert on your credit report. A fraud alert indicates to anyone requesting your credit file that you suspect you are a possible victim of fraud. A fraud alert does not affect your ability to get a loan or credit. Instead, it alerts a business that your personal information might have been compromised and requires that business to verify your identity before issuing you credit. Although this may cause some short delay if you are the one applying for the credit, it might protect against someone else obtaining credit in your name.

To place a fraud alert, contact any of the three major credit reporting agencies listed above and request that a fraud alert be put on your file. The agency that you contacted must notify the other two agencies. A fraud alert is free and lasts 90 days but can be renewed.

**Credit Freeze:** A credit freeze prohibits a credit reporting agency from releasing any information from a consumer's credit report until the freeze is lifted. When a credit freeze is in place, no one – including you – can open a new account. As a result, please be aware that placing a security freeze on your credit report may delay, interfere with, or prevent the timely approval of any requests you make for new loans, credit, mortgages, employment, housing, or other services.

Placing a credit freeze is free. To place a credit freeze, contact all three credit reporting agencies listed above and provide the personal information required by each agency to place a freeze, which may include:

1. Your full name (including middle initial as well as Jr., Sr., II, III, etc.)
2. Social Security number
3. Date of birth
4. If you have moved in the past five (5) years, the addresses where you have lived over the prior five years
5. Proof of current address, such as a current utility bill or telephone bill
6. A legible photocopy of a government issued identification card (state driver's license or ID card, military identification, etc.)
7. If you are a victim of identity theft, a copy of either a police report, investigative report or complaint to a law enforcement agency concerning identity theft

When you place a credit freeze, you will be provided a PIN to temporarily lift or remove the credit freeze. A credit freeze generally lasts until you lift or remove it, although in some jurisdictions it will expire after seven years.

**Credit Lock:** Like a credit freeze, a credit lock restricts access to your credit report and prevents anyone from opening an account until unlocked. Unlike credit freezes, your credit can typically be unlocked online without delay. To lock your credit, contact all three credit reporting agencies listed above and complete a credit lock agreement. The cost of a credit lock varies by agency, which typically charge monthly fees.

You also may contact the U.S. Federal Trade Commission ("FTC") for further information on fraud alerts, credit freezes, credit locks and how to protect yourself from identity theft. The FTC can be contacted at 400 7th St. SW, Washington, DC 20024, by telephone at 1-877-382-4357 or online at **www.consumer.gov/idtheft.**

## ADDITIONAL RESOURCES

Your state Attorney General may also have advice on preventing identity theft, and you should report instances of known or suspected identity theft to law enforcement, your State Attorney General or the FTC.

**District of Columbia Residents:** The Attorney General can be contacted at the Office of the Attorney General, 400 6th Street NW, Washington, DC 20001; 1-202-727-3400; or https://oag.dc.gov/.

**Maryland Residents:** The Attorney General can be contacted at Office of Attorney General, 200 St. Paul Place, Baltimore, MD 21202; 1-888-743-0023; or https://www.marylandattorneygeneral.gov/.

**New York Residents:** The Attorney General can be contacted at 1-800-771-7755 or https://ag.ny.gov/. The Department of State Division of Consumer Protection can be contacted at 1-800-697-1220 or https://dos.ny.gov/.

**New Mexico Residents:** You have rights under the federal Fair Credit Reporting Act (FCRA), which governs the collection and use of information pertaining to you by consumer reporting agencies. For more information about your rights under the FCRA, please visit https://www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0096-fair-credit -reporting-act.pdf or www.ftc.gov.

**North Carolina Residents:** The Attorney General can be contacted at 9001 Mail Service Center, Raleigh, NC 27699-9001; 1-919-716-6400; or http://www.ncdoj.gov.

**Rhode Island Residents:** The Attorney General can be contacted at 1-401-274-4400 or http://www.riag.ri.gov/. You also may file a police report by contacting local or state law enforcement agencies.